**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| Neil Richardson, | |
| Plaintiff, | Civil No. 3:23-cv-01480 (TOF) |
| v. | |
| Willy L. Pham and Bi-Li Aviation, LLC, | March 31, 2026 |
| Defendants. | |

## MEMORANDUM OF DECISION

## I.    INTRODUCTION

This lawsuit arises from a failed deal about a private airplane.  (*See generally* Compl., ECF No. 1.)  The plaintiff, Neil Richardson, is a wealthy Englishman who "decided to explore the merits of purchasing an aircraft in order to travel around Europe."  (*Id.* ¶ 12.)  His personal assistants connected him with a Connecticut resident, the defendant Willy L. Pham ("Pham"), and Pham's company, Bi-Li Aviation LLC ("Bi-Li" and, together with Pham, "Defendants"), for the purpose of locating a suitable plane.  In November 2021, one of the assistants wired Pham $15,000 as an advance against his anticipated expenses.  In February 2022, after a plane was located, the assistant wired a refundable $100,000 deposit to an escrow agent.  In the fall of 2022, however, Richardson developed a serious health condition, and he decided not to complete the transaction.  In November 2022, he asked Pham to arrange for the refund of the $100,000 deposit.

Instead of arranging for the deposit to be returned to Richardson, Pham took it for himself. (*See* discussion, Section III.B *infra*.)  On November 29, 2022, Pham asked the escrow agent to send the $100,000 to Bi-Li's account, not to Richardson.  The agent balked at sending the refund

to a different account than the one the payment had originally come from, but Pham persisted, and ultimately the agent agreed to wire the money to the Bi-Li account on the condition that Pham provide "written instructions from Mr. Richardson" to that effect. So Pham went on Google.com and created a fake Gmail account for Richardson. He then sent an e-mail to that account, copied to the escrow agent, asking the sham "Richardson" to authorize "the refund of the deposit of $100,000 USD to . . . Bi-Li." Then, masquerading as Richardson, he responded to his own e-mail and pretended to "authoriz[e]" the transaction. The escrow agent asked for more assurance in the form of a photo ID, and Pham e-mailed her copies of Richardson's United Kingdom driver's license and passport, which he had acquired earlier in the transaction. The escrow agent then sent the $100,000 to Bi-Li.

Richardson sued to recover the $100,000. (*See generally* Compl., ECF No. 1.) He also contended that Pham never documented any expenses, and accordingly he sought to recover the initial $15,000 advance as well. He pled causes of action for civil identity theft, conversion, breach of fiduciary duty, and constructive fraud, and he sought compensatory damages, treble damages, punitive damages, attorneys' fees and costs, and prejudgment interest. The Defendants asserted several affirmative defenses, and they counterclaimed for additional expenses they claimed to have incurred beyond the $15,000 advance. (Answer, Affirmative Defenses & Counterclaim, ECF No. 26) (hereinafter "Answer").

The Court held a two-day bench trial (*see* Minute Entries, ECF Nos. 106, 108), and afterward the parties submitted post-trial briefs. (ECF Nos. 118, 119.) For the following reasons, the Court will find for Richardson on Counts One through Three, and it will award him $315,000 in compensatory damages. The Court will find for Pham on Counts Four and Five. Punitive damages, prejudgment interest, attorneys' fees, and costs are addressed in Section V below.

## II.    PROCEDURAL HISTORY

The Court begins by setting forth the relevant procedural history of the case.  Richardson filed this lawsuit on November 8, 2023, invoking this Court's diversity jurisdiction.  (Compl., ECF No. 1, ¶ 10.)  He asserted five causes of action:  (1) a violation of Section 52-571h of the Connecticut General Statutes, which is entitled "[a]ction for damages resulting from identity theft" (*id.* ¶¶ 36-42); (2) conversion with respect to the $100,000 deposit (*id.* ¶¶ 43-48); (3) conversion with respect to the $15,000 expense advance (*id.* ¶¶ 49-55); (4) breach of fiduciary duty (*id.* ¶¶ 56-60); and (5) constructive fraud.  (*Id.* ¶¶ 61-66.)  Richardson pled the first three counts against both Pham and Bi-Li, but he pled the last two against Pham only.  (*See generally id.*)  In his prayer for relief, Richardson sought "compensatory damages and general damages according to proof, but not less than $115,000;" "treble damages of $300,000;" "punitive damages;" "reasonable attorney's fees;" "prejudgment interest;" "costs of suit;" and "such other relief as the Court deemed just and proper."  (*Id.* at p. 15.)  The Clerk of the Court initially assigned the case to the Honorable Sarala V. Nagala, United States District Judge.

The Defendants answered the complaint on January 26, 2024.  (*See generally* Answer.) They denied several material allegations of the complaint (*e.g., id.* ¶¶ 24, 25, 35), but they admitted some (*e.g., id.* ¶ 34) (admitting that the escrow company wired the deposit to Bi-Li, not Richardson), and they pled insufficient knowledge as to others.  (*E.g., id.* ¶ 28) (responding to the allegation that "Pham created a fake email address in Richardson's name" by claiming to "lack sufficient knowledge to admit or deny").  They asserted affirmative defenses of failure to state a claim, lack of subject matter jurisdiction, equitable estoppel, unclean hands, setoff, and authority. (*Id.* at pp. 8-10.)  Finally, they asserted a counterclaim for unjust enrichment, alleging that "Richardson has obtained benefits under circumstances that are unjust."  (*Id.* p. 10.)  Richardson

3

then answered the counterclaim on October 1, 2024, denying it in all material respects and asserting affirmative defenses of unclean hands and "impossibility of counter-restitution" (Answer to Counterclaim, ECF No. 34), and the pleadings closed.

Discovery opened on January 5, 2024, but it took more than a year to complete. (*Compare* Rule 26(f) Rpt., ECF No. 18, at 1 (stating that parties held their Rule 26(f) conference on January 5, 2024) *with* Jt. Status Rpt., ECF No. 61 (reporting on February 7, 2025 "that discovery is complete").) There were two principal reasons for this. First, both sides changed counsel during the discovery phase of the case. (*See* ECF Nos. 41-44, 48-49, 51-52, 55.) Second, Pham tried to force a settlement of the dispute in 2023 by wiring a portion of the $100,000 deposit to Richardson and keeping the rest for himself. (*See* discussion, Section III.B.4 *infra.*) During discovery, however, the parties learned that Pham had bungled the wire transfer and mistakenly sent the funds to a company called Luxury Lighting instead. (Jt. Mot. to Extend Discovery Deadline, ECF No. 38, ¶ 4) (stating that Richardson's wire transfer instructions had become "confused" with Luxury Lighting's). They held off on taking depositions while they explored whether Luxury Lighting would return the funds, apparently on the thinking that the case might then become easier to settle. (*Id.* ¶¶ 6, 8-9.) But Luxury Lighting did not return the money (*id.* ¶ 7), and in part for this reason, it was not until February 7, 2025 that the parties reported that discovery was complete. (Jt. Status Rpt., ECF No. 61.)

Both sides then consented to Magistrate Judge jurisdiction (Jt. Status Rpt., ECF No. 64), and Judge Nagala transferred the case to the undersigned. (ECF No. 66.) The parties also waived their right to a jury trial, and consented to a bench trial. (Jt. Status Rpt., ECF No. 64.) In the run-up to trial, Richardson moved for leave to amend his complaint to assert two new claims for negligence arising from the bungled wire transfer. (Pl.'s Mot. for Leave to Amend, ECF No. 98.)

The Court denied the motion for failure to demonstrate "good cause" for a late amendment under Rule 16. (Order, ECF No. 101.) Also in the run-up to trial, the parties stipulated to twelve agreed facts about the case. (Pls.' Trial Memo., ECF No. 85, at 11-12) (hereinafter "Stipulation").

The Court then held a two-day bench trial. Richardson presented testimony from his two personal assistants, Tristan Malfait and Boryana Pitson, in addition to his own testimony. He also introduced forty documentary exhibits, without objection from the Defendants. (Trial Transcript at 4:9-5:4 (hereinafter "Tr."); *see also* ECF No. 110 (reflecting admission of Plaintiff's Exhibits 1-38, 9A, and 24A).) For their part, the Defendants presented testimony only from Pham, and they introduced eight documentary exhibits without objection from Richardson. (Tr. at 5:7-21; *see also* ECF No. 111 (reflecting admission of Defendants' Exhibits A through H).) After the court reporter completed and docketed the trial transcript, each side submitted a post-trial brief. (Pl.'s Post Trial Br., ECF No. 119; Defs.' Trial Memo., ECF No. 118.) The case is therefore ripe for decision.[1]

## III.  FINDINGS OF FACT

### A.    Applicable Legal Principles

Rule 52(a) of the Federal Rules of Civil Procedure provides that, "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially[.]" Fed. R. Civ. P. 52(a)(1). The Court is obligated to find only those facts that are "material to the resolution of the parties' claims." *Clark v. Quiros*, No. 3:19-cv-575 (VAB), 2024 WL 3552472, at *5 (D. Conn. July 26, 2024) (quoting *Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-cv-690 (JJM), 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016)), *reversed and remanded on other grounds sub*

---

[1]    While this decision was being prepared, the attorney who tried the case for the Defendants, Jonathan Einhorn, surrendered his law license and retired from the bar of this Court. (*See* Notice, ECF No. 120.) The Defendants are now represented by Attorney Michael Hillis. (Appearance, ECF No. 122.)

*nom. Clark v. Valletta*, 157 F.4th 201 (2d Cir. 2025).  Stated another way, "courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach." *I.N.S. v. Bagamasbad*, 429 U.S. 24, 25 (1976).  In this Section III, therefore, the Court will find those facts that are necessary for the resolution it reaches.  It is not required to determine those factual disputes that were presented at trial but are unnecessary to that resolution.

Findings of fact and conclusions of law must be stated separately.  Fed. R. Civ. P. 52(a)(1) (stating that the district court must "find the facts specially and state its conclusions of law separately").  With that said, the distinction between law and fact can sometimes be "anything but clear-cut."  *Clark*, 2024 WL 3552472, at *5 (quoting *Cliffstar*, 2016 WL 2640342, at *1); 9 Moore's Federal Practice § 52.15[1] (Matthew Bender 3d ed. 2024) (same).  For this reason, while the Court will endeavor to set forth its factual findings in this Section III, it may make certain subordinate findings while reaching its conclusions of law in Section IV.  *See Int'l Bldg. Supply, LLC v. Hudson Meridian Constr. Grp., LLC*, __ F. Supp. 3d __, 2025 WL 3096605, at *8 (D. Conn. Nov. 6, 2025); *see also Negron v. Mallon Chevrolet, Inc.*, No. 3:08-cv-182 (TPS), 2011 WL 6002082, at *1 (D. Conn. Nov. 30, 2011); *cf. also March v. United States*, No. 3:17-cv-2028 (VAB), 2021 WL 848723, at *6 (D. Conn. Mar. 5, 2021) ("[F]or purposes of appellate review, the labels of fact and law assigned should not be considered controlling." (citation and quotation marks omitted)).  To the extent that the Court makes such findings in Section IV, they are incorporated into this Section III by reference.

In performing its fact-finding function during and after a bench trial, the Court may decide "whose testimony to credit" and "which . . . inferences to draw[.]"  *Chacko v. DynAir Servs., Inc.*, 272 F. App'x 111, 112 (2d Cir. 2008) (summary order).  Moreover, "as trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony

of any given witness." *Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (citations and quotation marks omitted). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and [a] reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

### B.    Findings of Fact

After listening closely to the trial testimony, the Court carefully studied the entire trial transcript. It also carefully reviewed all forty-eight documentary exhibits, along with the twelve stipulated facts and the parties' post-trial briefs. Having done so, the Court finds the following facts.

### 1.    *The parties and their attempted transaction*

The plaintiff, Neil Richardson, is a citizen of the United Kingdom. (*See* Stipulation ¶ 1; Tr. 120:12-13, 121:4; Pl.'s Exs. 1, 12.) He holds a degree in chemistry from Oxford University (Tr. 121:18-25), but after graduation, he chose a career in business rather than science. (Tr. 122:2.) He worked for Bain & Co., First Boston, and Kohlberg Kravis Roberts Co. before founding his own private equity firm. (Tr. 122:2-9.) He has acquired considerable wealth – or, as he put it, "financial latitude" – and he owns two homes in England, one in southern Corsica, and one in the Bel Air neighborhood of Los Angeles. (Tr. 120:25-121:2, 122:15.) He employs a personal staff, including Malfait, the manager of his Corsican property, and Pitson, his UK-based personal assistant. (Tr. 14:6-11, 98:9-19.)

In the summer of 2021, Richardson began to consider buying a private airplane. (Tr. 16:3-14.) From his house in Corsica he traveled to other Mediterranean islands, and he found commercial flights between islands to be "cumbersome" because they required connecting through Nice on the French mainland. (Tr. 125:4-9.) Richardson had previously "bought . . . hours" on a

plane, meaning that he had essentially bought a timeshare in another person's aircraft (Tr. 124:17-22, 125:19-22), but he had never previously owned a plane himself.  Several of his wealthy friends owned planes, however, and based on their advice he became interested in an Italian model called a Piaggio Avanti.  (Tr. 125:9-13, 135:3-8.)

The relationship began later that summer, when Richardson asked Malfait to help him locate a plane.  (Tr. 16:13-14.)  Malfait had no prior experience with aircraft, but he knew a local pilot named Joseph Bohn.  (Tr. 16:19-21.)  Bohn put Malfait in touch with another French pilot named Yvan Pham, who had connections to the U.S. aircraft market through his brother Willy.[2] (Tr. 16:19-24, 68:17-19, 276:20-23.)  Willy Pham is also a pilot, but unlike his brother Yvan, he resides in the United States.  (Tr. 234:6; *see also* Tr. 223:24 (stating that Pham resides in Terryville, Connecticut).)  In addition to his work as a pilot, Pham helps other people buy and sell aircraft.  (Tr. 234:9-11.)  He conducts that business through several limited liability companies, including Tango-Lima Aviation, LLC as well as Bi-Li.  (*See* Stipulation, ¶ 3.)  Malfait and the Defendants began working together in the second half of 2021.  (*See id.* ¶ 4; *see also* Pl.'s Ex. 26 (WhatsApp message chain reflecting that Malfait's correspondence with Yvan Pham began on July 15, 2021).)

The parties never quite agreed on exactly what the Defendants would do to help Richardson acquire his plane.  At trial, the witnesses gave differing testimony on the nature and scope of the Defendants' engagement.  On the one hand, Malfait testified that the Defendants' role was "to locate planes that were on sale at the time within the price range . . . and tell us whether we could purchase or not."  (Tr. 20:2-5.)  Pham agreed that his "mission" was to "search for a specific airplane that the potential buyer, Mr. Richardson, was looking for."  (Tr. 236:5-6.)  On the other

---

[2]    Because Willy Pham is much more central to this case than Yvan Pham, all references to "Pham" in this Memorandum of Decision are to Willy Pham.

hand, Richardson evidently did not think that he needed help in locating a plane, because he "kn[e]w a reasonable amount about planes" and could find Piaggio Avantis on the internet himself. (Tr. 126:23-127:6.) In his view, the Defendants' principal role would be to sell the hours that the plane was not in use, to defray "hangarage costs and the maintenance costs and the pilots' salaries." (Tr. 127:11-22.)

Yet although the three witnesses' testimony seemingly conflicts on this point, it can be harmonized. The Court finds that Richardson did not clearly communicate his intentions to Malfait, and that Malfait therefore did not communicate that intention to Pham. Specifically, Richardson thought he had engaged Pham and Bi-Li less to find an Avanti to buy, and more to set up post-purchase time-sharing arrangements that would defray some of the costs of ownership. (*See* Tr. 127:11-22) (explaining that he thought the Pham brothers' role was to "achieve a set of arrangements" whereby "the hangarage costs and the maintenance costs and the pilots' salaries" would be "paid for by the offtake of hours"). But he did not clearly transmit that intention to Malfait or Pham, with the result that they both thought Pham had been engaged principally to find a plane.[3] A written contract might have resolved the unclarity, but the parties never executed one. (*See* Tr. 160:21-24, 237:24-238:1; *see also* Defs.' Post-Tr. Br., ECF No. 118, at 2 ("There was no written agreement between the parties.").)

---

[3]   As will become evident from the discussion that follows, the Court found Pham to be almost entirely lacking in credibility, except for those instances in which he made admissions against his own interest. Yet as noted above, "the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Krist*, 688 F.3d at 95 (citations and quotation marks omitted). This is one of the few points on which the Court found Pham's testimony to be worthy of belief, because it aligned with aspects of Malfait's testimony that the Court also found credible.

Money first changed hands between the parties in November 2021, when Malfait arranged payment of a $15,000 advance to Pham.[4] (Tr. 101:12-18.) After that payment, the parties began discussing specific aircraft. On December 9, 2021, Pham wrote an e-mail to his brother Yvan, evidently intended for forwarding to Richardson and Malfait, about a 2002 Avanti with a registration number of N79CN ("Aircraft N79CN"). (Defs.' Ex. G, at 1-3.) The e-mail was entitled "Aircraft Inspection Report, Exterior and Interior, and Maintenance Records (Done on Monday Dec. 6 2021)," and it contained details on the plane's airframe, engines, maintenance history, and so forth. (*Id.*) Yet despite the e-mail's title and seeming detail, Pham had not actually inspected Aircraft N79CN in December of 2021. He testified that the custom among aircraft sellers is not to permit an inspection without a deposit (Tr. 248:12-18), and no deposit had been made at that point. Moreover, Aircraft N79CN was in Europe at the time (Tr. 242:11-13), and Pham never documented any travel there.

Pham first raised the issue of a deposit with Richardson two days after this initial communication. In e-mail to Yvan on December 11, 2021, also intended for forwarding to Richardson and Malfait, Pham stated that "in order to make an offer to the Seller, we need to show a good faith deposit into escrow." (Defs.' Ex. G, at 1.) He added that, "[a]s soon as we have a deal in between the parties, a pre-buy inspection of the aircraft will be organized and scheduled at the Piaggio Avanti maintenance facility in Germany[,]" after which "a report will be issued" and "we will have the option to decide if we will accept the airplane (under certain conditions) or we will have the option the [*sic*] reject the airplane completely." (*Id.*) He then stated that "if we

---

[4]    The exact nature of this advance was a contested issue at trial, with Richardson contending that it was an advance only against documented hard costs, and Pham contending that it was intended to cover professional services as well. The Court will address this dispute in Section III.B.3 *infra.*

choose to reject the airplane, your refundable deposit in escrow will be automatically returned to you." (*Id.*)  Yvan Pham forwarded the e-mail to Malfait later that day. (*Id.*)

Richardson initially resisted the idea of a deposit, even a refundable one. (Tr. 31:1-3.)  He explained that if the seller was concerned about his financial "bona fides," he could have provided a letter from his bankers, "saying what the current level of funds [he] had on deposit were." (Tr. 133:15-21.)  But after "persistent requests and denials by [him] to send $100,000," he "eventually got worn down" by "being badgered by [Malfait] on behalf of Pham to send this money." (Tr. at 133:22-25.)   In reliance on the representation that the money would be fully refundable, Richardson relented and agreed to make the deposit. (Tr. 133:25-134:3.)

While this discussion was taking place, a different plane came into view. (Tr. 143:21-144:1.)  Pham identified a 2006 Piaggio P.180 Avanti in Texas, with serial number MSN P-1121 ("Aircraft 1121").   He then prepared a letter of intent ("LOI") dated February 15, 2022, "confirm[ing] the intent of Mr. Neil A. RICHARDSON . . . to purchase" Aircraft 1121 for $2,700,000. (Pl.'s Ex. 3; Defs.' Ex. D.)  Although Bi-Li did not own the plane, the LOI listed Bi-Li as the Seller. (Defs.' Ex. D, at 2.)  The LOI obliged Richardson to "place, as a fully refundable deposit, the amount of $100,000 USD . . . in an escrow account of the Buyer's choice . . . within two business days" of the document being signed by the Seller. (*Id.*)  Malfait signed the LOI on Richardson's behalf on February 16, 2022. (*Id.*; *see also* Tr. 27:23-25.)

Although neither side produced a seller-signed copy of the LOI (*see* Pl.'s Ex. 3, Defs.' Ex. D), and although Richardson was therefore ostensibly not required to make the deposit, the parties began making payment arrangements the next day.  Pham had previously contacted an Oklahoma escrow company called Aviators Title and Escrow, LLC ("Aviators"), and on February 17, 2022, the company sent him its wire transfer instructions. (Pl.'s Ex. 37.)  On February 18, 2022, Aviators

11

opened an account in expectation of receiving the deposit. (Pl.'s Ex. 30.) On February 22, 2022, Richardson re-confirmed his interest in Aircraft 1121 and stated that he would "organize the transfer of 100k Dollars to secure" the plane the next morning. (Pl.'s Ex. 21.) Specifically, he said that "the amount will be transferred to the escrow account for Bi-Li Aviation, LLC from [his] JP Morgan account." (*Id.*)

The money moved from Richardson's account to Aviators' account on February 23, 2022 (*see* Pl.'s Ex. 9, at 1), and the technical details of that movement are worth recounting, because they will be relevant to the discussion that follows in Section III.B.4 below. The money transfer began when Richardson asked his UK personal assistant, Pitson, to handle the arrangements. (Tr. 30:7-13.) At about the same time, Richardson also asked Pitson to wire $51,900 to Luxury Lighting, a Los Angeles contractor that was working on his Bel Air home. (*See* Pl.'s Ex. 23; Tr. 136:13-22.) On February 23, 2022, Pitson sent a single electronic message to Richardson's US banker, Charlotte Dupin at J.P. Morgan Private Bank, asking her to make both transfers. (Pl.'s Ex. 23.) Dupin did so, and she confirmed the transfers in a single electronic message that likewise contained SWIFT information for both Aviators and Luxury Lighting. (Pl.'s Ex. 8.) The fact that two separate payment instructions and confirmations were included in the same electronic messages will figure prominently in the events described below.

In any event, the deal for Aircraft 1121 did not go through, and the parties considered other aircraft throughout most of the rest of 2022. On March 28, 2022, Pham signed an LOI for a 2001 Piaggio Avanti with registration number N29JS ("Aircraft N29JS") (Pl.'s Ex. 31), and Aviators noted the change the next day. (Pl.'s Ex. 30, at 5) ("[t]ransfer[ring]" escrow deposit "to N29JS"). That transaction also did not occur, and in June of 2022, the parties' attention returned to Aircraft N79CN. Pham asked Aviators to transfer the escrow to that plane on June 29, 2022 (Pl.'s Ex. 7,

at 2), and on July 3, 2022 he prepared an LOI with a purchase price of $2,500,000.  (Pl.'s Ex. 18.)

The LOIs for both Aircraft N29JS and Aircraft N79CN recited that Richardson's deposit was

"fully refundable."  (Pl.'s Exs. 31, 18.)

In the spring of 2022, Pham recommended that Richardson establish a US limited liability

company, and that the company own whatever aircraft he ultimately decided upon.  (Tr. 35:13-17;

*see also* Pl.'s Ex. 22.)   Pham wrote to Malfait that, "[a]ccording to the Federal Aviation

Administration (FAA) regulation, the identity structure that registers an aircraft with the FAA has

to be a U.S. citizen or a U.S. corporation."  (Pl.'s Ex. 22.)  Richardson resisted this strategy as

well, arguing that it was "completely and utterly unnecessary" at that stage of the transaction.  (Tr.

138:15-17.)  He also worried that establishing an LLC would create "a loose end that would need

to be dissolved afterwards" if the transaction did not go through.  (Tr. 139:2-10.)  Nevertheless, he

ultimately relented and permitted Pham to set up a Delaware LLC.  (Tr. 39:11-12.)   The name

"Aeolus Holdings, LLC" was chosen, after the name of Richardson's Corsican villa.  (Tr. 142:18-

19.)  Pham asked the Delaware Secretary of State to incorporate Aeolus on April 8, 2022 (Defs.'

Ex. F, at 2), and the Secretary recorded the company's certificate of formation on May 11, 2022.

(*Id.* at 3.)  So far as the record discloses, the parties never discussed or contemplated that Pham

would own the company that would own Richardson's plane.  Nevertheless, Pham set himself up

as the sole member of Aeolus.  (Tr. 275:1-6.)

On September 8, 2022, Richardson experienced a significant, adverse health event.  (Tr.

123:8-13.)[5]  He learned that he would have to have an operation, and he concluded that he "did

not want to layer the complication of a purchase of a plane and everything that would go along

---

[5]    He did not remember the exact date at trial, but he stated that it was "the day that the Queen died."  (Tr. 123:9-11.)  The Court takes judicial notice that Queen Elizabeth II died on September 8, 2022.

with that on top of" his surgery. (Tr. 190:16-24.) He therefore asked Malfait to stop pursuing the project. (Tr. 46:19-24.)

The termination of the project left three issues to be resolved. First, the Defendants sought compensation for their "professional services" in attempting to locate a suitable plane. (*See* Pl.'s. Ex. 14.) Second, the Defendants contended that they had incurred expenses and "paperwork fees" exceeding the advance (*see id.*), while Richardson asserted that they had not documented any expenses, let alone fifteen thousand dollars' worth. (Tr. 155:13-18.) Third, Richardson's deposit had not been returned. (*See* Pl.'s Ex. 25.) Those issues remained unresolved by the time the parties reached trial. The Court will address each one in turn.

### 2.   *The Defendants' professional services*

Although the parties never quite agreed on the role that the Defendants would play in Richardson's quest to buy a plane (*see* discussion, Section III.B.1 *supra*), they appear to have discussed what their relationship might look like once a deal was done. The Defendants stated their view of the anticipated arrangement in their Counterclaim:

> Private aircraft require regular and ongoing maintenance and management—costly services, which Pham provides through a company he owns. He agreed to assist Richardson with the expectation that, upon acquisition of the aircraft, his company would be hired to manage the aircraft and paid a market management fee— approximately, $50,000 per year. He required that Richardson reimburse him for all of the expenses he would incur in connection with his efforts—which he explained to Richardson could be substantial. Richardson agreed.

(Answer at p. 5.) Although Richardson denied most of this description in his answer (Answer to Counterclaim, ¶7), his trial testimony was consistent with it in some particulars. (*Cf.* Tr. 131:23-132:8) (discussing the Defendants' contemplated "annual management compensation," but disputing that a specific figure of $50,000 was agreed upon).

The parties did not, however, agree in advance how the Defendants would be compensated for their efforts if no plane was purchased. (Tr. 161:21-22.) After the deal failed in the fall of

14

2022, they attempted to negotiate a resolution of that issue, but those negotiations ultimately failed. Malfait initially proposed that the Defendants be paid $10,000 for their services, on top of whatever portion of the $15,000 expense advance they could show they were entitled to keep. (*See* Tr. 49:17-24.) Pham rejected that proposal as insufficient, so Malfait increased the offer to $20,000 (Tr. 50:1-3), with the money expected to come out of the $100,000 deposit once it was refunded by Aviators. (Pl.'s Ex. 20.) Malfait memorialized this proposal in a letter that he wrote over Richardson's name on November 15, 2022 (Pl.'s Ex. 25), and Pham seemingly agreed at first. (Tr. 84:18-21.) But on December 19, 2022, Pham sent an invoice on Bi-Li letterhead claiming $56,380, less a $15,000 credit for the 2021 advance.[6] (Pl.'s Ex. 14.) Richardson and Malfait both thought the invoice was "ridiculous" and entirely unsupported, and Richardson refused to pay it. (Tr. 58:13-15, 157:15-17.) The negotiations thus failed, and consequently, the question of whether the Defendants were entitled to compensation for their efforts—and, if so, in what amount—remained unresolved at time of trial. (*See generally* Answer at pp. 4-8, 10) (asserting counterclaim for unjust enrichment for "benefits" that they provided to Richardson without compensation).

The Defendants failed to prove that they did anything more than a *de minimis* amount of work on the project, let alone any work that benefitted Richardson. There was no credible testimony that Pham inspected even a single airplane,[7] and aside from the incredible and self-

---

[6]    Pham initially attempted to suggest that the Bi-Li invoice was consistent with, and therefore constituted an acceptance of, Malfait's written proposal. (Tr. 266:4-8) (contending that the invoice reflected only $20,000 for "professional services," with the remainder representing "expenses" and other hard costs). But he quickly conceded that the $32,780 attributed to "[a]irplane [s]earches and [e]xpenses" was not actually expense and hard cost, but rather charges for "[his] time." (Tr. 266:11-13.) The Court finds as fact that any discussion of $20,000 as an appropriate level of compensation for the Defendants' alleged "professional services" never reached the point of an enforceable agreement.

[7]    Malfait did testify that "three or four were probably inspected" (Tr. 25:1-2), but only because Pham told him so, and at trial Pham claimed to have inspected only two. (Tr. 241:17-19.) Moreover, even that testimony was not credible. Pham claimed to have inspected planes in Paris

serving Bi-Li invoice (Pl.'s Ex. 14), no exhibits documenting him doing so. So far as the English-language exhibits disclose,[8] the Defendants' "professional services" consisted of: (1) e-mailing a report of someone else's inspection of Aircraft N79CN (Defs.' Ex. G); (2) e-mailing wiring instructions for the $15,000 advance (Pl.'s Ex. 2); (3) setting up an escrow account to hold a deposit that Richardson did not want to make (Pl.'s Exs. 9, 37); (4) making minor adjustments to letters of intent that Pham had previously written for other clients, to reflect the identifying information of planes under consideration (Pl.'s Exs. 3, 18, 31; Defs.' Ex. D; *see also* Tr. 286:15-16, 287:10-288:9); (5) e-mailing Aviators to get it to move the escrow deposit from one plane to another (Pl.'s Exs. 7, 33); (6) setting up an LLC that Richardson did not want to set up, and that Pham made himself sole member of (Pl.'s Ex. 19; Defs.' Ex. F); and (7) scheming to mis-direct Richardson's deposit into Bi-Li's account, as will be shown below. (Pl.'s Exs. 4, 6, 11.) This is no more than a *de minimis* amount of work, and virtually none of it was to Richardson's benefit.

### 3. The Defendants' expenses and the $15,000 advance

As noted above, the nature of Richardson's $15,000 advance to the Defendants was a contested issue at trial. On the one hand, Pham contended that it was intended to compensate him for his time spent searching for a plane, as well as for hard costs related to the search such as travel

---

and in "New York . . . or Pennsylvania," but he produced no photographs of those planes, no inspection reports, no travel receipts, etc. The absence of travel documentation renders Pham's claim particularly implausible, because he stood to be reimbursed for any documented travel expenses out of the $15,000 advance.

[8]    Richardson introduced two exhibits that were almost entirely in French. Exhibit 26 was a printout of the WhatsApp message chain between Malfait and Yvan Pham, and Exhibit 28 was a printout of the WhatsApp chain between Malfait and Willy Pham, whose first language is French even though he lives in Connecticut. (*See* Tr. 249:19.) Neither party translated these exhibits, but the Court can nevertheless tell that the chain between Pham and Malfait did not even begin until February 2, 2023, long after the project fell apart. (*See* Pl.'s Ex. 28.) Thus, if the Defendants' "professional services" were principally composed of Willy Pham's "time . . . searching, on studying books, [and] on the phone with brokers," as they contended at trial (Tr. 266:13-19), Exhibit 28 does not document him doing so.

and inspection fees. (Tr. 281:7-9.) But on the other hand, Malfait and Richardson both testified that the payment was an advance against expenses—and only documented expenses at that. (Tr. 42:4-7; 60:23-61:8; 150:8-16.)

The Court finds for Richardson on this contested point, for several reasons. First, Pham pled in his Counterclaim that the $15,000 payment was an initial advance on his "expenses," not on his labor. (Answer at p. 6.) Second, Pham stipulated before trial that Richardson wired him $15,000 "for *expenses* that Pham said he would incur while evaluating aircraft[,]" not for labor. (Stipulation, ¶ 5) (emphasis added). Third, even if he had not so pled and stipulated, Malfait's contrary testimony was detailed and persuasive on this issue. Malfait testified that "[t]he first request was for 15,000 U.S. dollars for travel expenses" (Tr. 21:7-8); that the parties understood that Pham might have to engage third-party inspection services, and that the $15,000 payment was also in contemplation of paying those vendors (Tr. 70:17-21); and that they also expected that Pham would prove any claims against the advance with invoices or other documentation. (Tr. 92:16-22.) Malfait also plausibly explained how the Defendants would ultimately be compensated for their labor. (Tr. 21:23-22:2) (explaining that, once a plane was located and purchased, Yvan Pham would become its pilot and there would be "a package of a monthly fee, annual fee, to run the plane"). Fourth, Richardson's testimony was similarly persuasive on this point; he characterized the $15,000 payment as an "advance for out-of-pocket payments to third-party people who were involved in the process," not as an advance on Pham's bill for his own time. (Tr. 134:12-14; *see also* 157:23-25.) Fifth, Pham's testimony lacked details that one might have expected if such a deal had been reached. If indeed the parties had agreed that the $15,000 would compensate Pham for his labor as well as his expenses, one might have expected agreement on an hourly or other rate for that labor, but Pham did not testify to any such agreement. In summary,

17

even if the parties had not stipulated to Richardson's view of this issue, the testimony he presented was more persuasive. The Court therefore finds that the parties agreed upon a $15,000 advance toward the Defendants' documented expenses, not toward their labor.

Having found that the $15,000 advance was only intended to cover documented expenses, the Court next finds that the Defendants failed to prove any such expense. For example, Pham claimed to have traveled to Paris to inspect a plane (Tr. 241:10-12), but he provided none of the evidence that one would expect—no photograph of the plane allegedly inspected, no credit card bill for the plane ticket, no receipt for the hotel stay, etc. He further claimed to have incurred attorneys' fees in setting up Aeolus, and in having the LOIs reviewed (Tr. 267:6-9, 286:18), but he provided no bill or engagement letter from any attorney. And although he likely incurred an incorporation fee in registering Aeolus with the Delaware Secretary of State, he provided no proof of what that expense was. In summary, although Richardson had agreed to reimburse the Defendants' documented expenses, and although he had advanced them $15,000 for that purpose, the Defendants did not prove even a dollar's worth of expense.

### 4. Richardson's deposit

As noted above, Richardson paid a $100,000 deposit into an escrow account at Aviators in February of 2022. (Pl.'s Ex. 9.) The money moved after his assistant, Pitson, sent wire instructions for both the $100,000 deposit and the $51,900 Luxury Lighting payment to his US banker in the same electronic message. (Pl.'s Ex. 23.) As the parties' attention shifted from plane to plane over the spring and summer of 2022, Aviators noted the changes in its records. (*E.g.,* Pl.'s Ex. 30, at 5) (noting transfer of deposit to Aircraft N29JS). In the fall of 2022, Richardson experienced his health issue, and he lost interest in purchasing a plane. (Pl.'s Ex. 25.)

On November 29, 2022, Pham wrote to an Aviators employee named Debbie Wilson. (Pl.'s Ex. 6.)  He explained that he was "not going to pursue the purchase/acquisition of [Aircraft] N79CN any more." (*Id.*)  He then asked Wilson to "wire the deposit back"—but not to Richardson. (*Id.*)  Instead, he asked Wilson to wire the deposit "to BI-LI Aviation, LLC." (*Id.*)

Wilson responded six days later.  (Pl.'s Ex. 5, at 3.)  She noted that Aviators had not "received a deposit from the account of BI-LI- Aviation LLC for N79CN." (*Id.*)  She explained that "[f]unds can only be returned to the account they were wired from originally"—in other words, to Richardson's account at J.P. Morgan Private Bank.  (*Id.*; *see also* Pl.'s Ex. 8.)  She asked Pham to "provide some background information to help [her] understand how BI-LI Aviation LLC is connected to the deposit for N79CN[.]" (Pl.'s Ex. 5, at 3.)

Pham replied later that afternoon.  (*Id.* at 2.)  He attached the wire transfer receipt from February, and he directed Wilson's attention to the "reference" field, which stated that the transfer was "on behalf of BI-LI Aviation, LLC." (*Id.*; *see also* Pl.'s Ex. 8.)  He noted that the deposit had originally been directed to Aircraft 1121, but he reminded her that Aviators had transferred the escrow to Aircraft N79CN in June.  (Pl.'s Ex. 5, at 2.)  He closed by asking Wilson to "advise if this above information is sufficient . . . to wire this $100,000 to the BILI Aviation Wells Fargo bank account, as requested," or whether instead she needed "any additional information . . . to complete this wire transfer to BILI Aviation, LLC." (*Id.*)

Wilson wrote again two days later.  She thanked Pham for the additional information, but she explained that "[s]ince the transaction referenced in the wire wasn't completed, we need written instructions from Mr. Richardson regarding this deposit." (*Id.* at 1-2.)  She added that "anti-money laundering procedures require us to connect all the dots." (*Id.* at 2.)  She asked Pham to "please have Mr. Richardson send [her] an email from his personal email account." (*Id.*)

19

Instead of contacting Richardson and asking him to authorize the transfer of the deposit to Bi-Li's account, Pham went on Google.com and created a Gmail account with an e-mail address of "neil.a.richardson1963@gmail.com." (Pl.'s Ex. 17; *see also* Tr. 309:22-24 (Q.: "And you went on Google and you typed it in and created an email address in his name, didn't you?" A: "Yeah[.]"); Tr. 259:5-14 (admitting "ma[king] up an email with Mr. Richardson's name on it to get back the $100,000 escrow").) He used Richardson's name to set up the account. (*See* Pl.'s Ex. 17, at 4) (documenting that, when Pham logged on to Google.com to create the Gmail account, he gave his name as "Neil Richardson"). Pham then sent an e-mail from his own account to the sham account he had just set up, with a copy to Wilson, in which he asked "Niel" [*sic*] to "send an email to Debbie requesting Aviators Title and Escrow, LLC to initiate a bank wire re: the refund of the deposit of $100,000. USD to the BI-LI Aviation Wells Fargo account." (Pl.'s Ex. 5, at 1.) The next morning he wrote back from the sham account, posing as Richardson:

> Dear Ms. Wilson,
>
> In response to your email sent to Willy Pham and per your request, please accept this letter as my authorization for Aviators Title and Escrow, LLC, to initiate the Bank Wire Transfer in the amount of $1,000,000 [*sic*] USD to Beneficiary BI-LI Aviation, LLC, as a total refund of the initial deposit that was received by your Escrow Trust Account (and on behalf of BI-LI Aviation, LLC), dated February 23, 2022.
>
> Please see as an attachment (Bi-LI Aviation Wells Fargo Bank Wiring instructions.)
>
> Thank you very much,
>
> Best Regards,
>
> Neil Richardson

(*Id.*; *see also* Pl.'s Ex. 11.) Pham admitted at trial that, "by fraudulently misrepresenting [him]self as Mr. Richardson, [he] led Aviators Title to believe that they were communicating with him." (Tr. 309:7-10.)

Even so, Wilson required additional security measures before she would wire the money to a different account than it had come from.  (Pl.'s Ex. 11, at 1.)  Later that day, she wrote an e-mail addressed to "Neil"—because again, she thought she was corresponding with Richardson—and asked him to "send . . . a scanned copy (or digital picture) of [his] photo ID (Drivers License or Passport)."  (*Id.*)  She promised to "get the wire transfer set up so it's ready to go as soon as we receive your ID."  (*Id.*)

Pham wrote back later that evening, and he doubled down on his scheme.  Several months before, he had asked Malfait to provide him with copies of Richardson's UK driver's license and passport.  (Tr. 40:21-41:4.)  He told Malfait that he would be using the documents to incorporate Aeolus (*id.*)—even though, as noted above, he named himself and not Richardson as the sole member of the LLC.  Malfait then obtained the documents from Pitson, who kept copies on hand "[f]or identification purposes" when conducting business on Richardson's behalf.  (Tr. 101:3-10; 112:11-23.)  Now, in response to Wilson's e-mail, Pham sent electronic images of the driver's license and passport that he had obtained months before.  (Pl.'s Ex. 11, at 1; *see also* Tr. 311:3-5 (Q.: "You sent Aviators Title Mr. Richardson's driver's license and passport, right?" A.: "Yes.").)  The images contained Richardson's UK driver's license number and his passport number.  (Pl.'s Exs. 1, 12.)  Pham then signed the e-mail, "Thank you, Neil."  (Pl.'s Ex. 11, at 1.)  With seeming authorization from "neil.a.richardson1963," and with a copy of Richardson's driver's license and passport, Wilson transferred the entirety of the $100,000 deposit to Bi-Li's bank account on December 8, 2022.  (Pl.'s Exs. 13, 35.)

Around the time that he induced Aviators to transfer the deposit to Bi-Li, Pham began to tell Malfait and Richardson a false story about the seller's response to the failure of the transaction.  Although Richardson's money had been on deposit with an escrow company rather than with the

21

owner of Aircraft N79CN, and although the deposit was fully refundable (*see* Pl.'s Ex. 9A), Pham began to tell the commercially unsophisticated Malfait that "the seller had the money" and "might not refund" it.  (Tr. 88:15-17, 48:2-4.)  He claimed that the seller had spent $400,000 repairing the plane in anticipation of the sale going through, and that once Richardson pulled out, "the $100,000 might be at risk."  (Tr. 307:10-24.)  None of this was true; again, the deposit had been with Aviators, not with the seller, and the terms of the escrow agreement made the deposit fully refundable.  (*See* Pl.'s Ex. 9A.)  But Pham continued to tell the false story, claiming that he set up the fake Gmail account and fooled Aviators "as "the quickest, most expeditious way to obtain the return of the deposit . . . before the seller of the aircraft seized it."  (Defs.' Post-Tr. Br., ECF No. 118, at 8.)[9]  This claim is entirely implausible, and the Court finds as fact that Pham maneuvered the deposit from Aviators' account to Bi-Li's not for the purpose of protecting it from an aggressive and covetous seller, but rather for the purpose of gaining leverage over Malfait and Richardson in the dispute over compensation.

Eleven days after Pham duped Wilson, Bi-Li sent Richardson the $56,380 invoice referenced above.  (Pl.'s Ex. 14.)  Richardson had previously instructed Malfait to pursue the return of the $100,000 deposit, but in November he had not been "particularly focused on it."  (Tr. 150:20-24.)  Upon seeing Bi-Li's "ridiculous" invoice, however—and upon Malfait telling him that Pham was characterizing the deposit as under threat—Richardson became more anxious to see the deposit returned.  (Tr. 153:12-13, 206:25-207:4.)  On his behalf, Malfait called Aviators at "the end of December or early January" to request a refund (Tr. 62:12-16), and Pitson sent an e-

---

[9]     Indeed, the Court is not persuaded that there ever was a seller.  The "Agreed and Accepted by Seller" space in the LOI for Aircraft N79CN is unsigned (Pl.'s Ex. 18), and the Defendants did not introduce any other documentary exhibit that would confirm his existence.  So far as the credible documentary evidence discloses, the "seller" could have been another of Pham's inventions.

mail to Wilson with a similar request.  (Tr. 109:25-110:2.)  Both were informed that the money had already been withdrawn.  (Tr. 63:16-17, 110:3-6.)  Ultimately, Wilson provided Richardson with the e-mail chain through which Pham had induced her to wire the deposit to Bi-Li.  (Pl.'s Ex. 32.)  Richardson testified that this was when "the penny dropped" and he "realized that [he had] been defrauded."  (Tr. 164:8-17.)

In the meantime, the parties were still disputing compensation for the Defendants' "professional services."  (*See* discussion, Section III.B.2 *supra.*)  On February 1, 2023, Pham attempted to force a settlement of that dispute by wiring $68,620 to Richardson's J.P. Morgan account.  (Pl.'s Ex. 24; *see also* Tr. 268:14-15 ("It wasn't an agreement, but this is something that I told him I was doing.").)  Pham continued to claim that the Defendants were owed $41,380—the full $56,380 invoice, less the $15,000 advance—but he decided to try to settle the matter for $31,380.  (Tr. 268:3-12; *see also* Defs.' Post-Tr. Br., ECF No. 118, at 5 ("Defendants agreed to discount this balance by $10,000[.]").)  He therefore attempted to wire $68,620 of the $100,000 deposit to Richardson, keeping $31,380 for himself.  (*Id.*)

When Pham went to make the transfer, he looked at the wire instructions that Pitson had sent him a year before.  That communication had Luxury Lighting's bank routing information as well as Richardson's.  (Pl.'s Ex. 8.)  Pham mistook Luxury Lighting's information for Richardson's, and he mistakenly instructed his bank to send $68,620 to Luxury Lighting's account. (*See* Pl.'s Exs. 15, 24, 24A.)  Pham then told Malfait that he had wired funds to Richardson's J.P. Morgan account, but Richardson knew this was untrue, because he had closed the account in the meantime. (Pl.'s Ex. 16.)  Several months later, Richardson filed this lawsuit.

Pham ultimately figured out his mistake during the discovery phase of the case.  His lawyers then attempted to recover the money from Luxury Lighting.  (Defs.' Ex. H.)  They also

sought the company's confirmation that the "money was not remitted . . . to Richardson." (*Id.* at 3.) Luxury Lighting neither returned the money nor accounted for it (*see id.* at 3), but Richardson testified that he was "not successful" in his own attempts to get the money back. (Tr. 196:6-9.) Thus, by the time of trial, the evidence was that Richardson had not recovered a penny of his fully refundable $100,000 deposit.

In summary, the Court finds as fact that (1) Pham induced Richardson to place a $100,000 deposit in escrow with Aviators by, among other things, representing to Malfait that a deposit was a necessary precondition to engaging with sellers, and that the deposit would be fully refundable (Defs.' Ex. G, at 1); (2) Pham induced Aviators to transfer the deposit amount to Bi-Li's account, rather than Richardson's account, by masquerading as Richardson; (3) the steps Pham employed to effectuate his masquerade included creating a sham e-mail account under Richardson's name (Pl.'s Ex. 17), and conveying Richardson's passport and driver's license numbers to Aviators to convince it that it was dealing with Richardson rather than Pham (Pl.'s Ex. 11); (4) Pham's purpose in effectuating this scheme was to induce Aviators to wire the $100,000 to Bi-Li's account; (5) Pham wanted the deposit to go to Bi-Li's account so he could use it as leverage in his negotiations with Richardson and Malfait over compensation for the Defendants' alleged "professional services": (6) even if Pham later developed an intention to return $68,620 of the $100,000 to Richardson, he did not actually do so, because he bungled the wire transfer and mis-routed the funds to Luxury Lighting; and (7) as a result of Pham's mistake, Richardson has yet to receive any of his deposit back.

At trial and afterward, Pham claimed to have been authorized by Malfait to conduct this masquerade. (*See* Tr. 259:15-19; *see also* Defs.' Post-Tr. Br., ECF No. 118, at 7.) He says that

Malfait told him to "do whatever you've got to do . . . to get the money back."[10] (*Id.*) But the Court finds as fact that neither Richardson nor his personal assistants ever authorized Pham to use fraudulent or illegal means to induce Aviators to pay the deposit to Bi-Li. (*See* Tr. 56:16-18, 143:7-13.) And the Court also finds as fact that, when Malfait told Pham to "get the deposit back," he meant back to Richardson, not back to Bi-Li. Thus, even if Pham had somehow been authorized to use means both fair and foul to "get the deposit back," he did not, in fact, get the deposit back where it belonged.

In the next section of this Memorandum, the Court will discuss the legal import of these findings. As noted above, although the Court has endeavored to set forth all its factual findings in this Section III, some subsidiary findings may be made in Section IV below. Any such findings are incorporated into Section III by reference.

## IV. CONCLUSIONS OF LAW AND HOLDINGS

### A. Jurisdiction

The Court begins by addressing its own jurisdiction. Richardson has invoked the Court's diversity jurisdiction under 28 U.S.C. §1332 (Compl., ECF No. 1, at ¶ 10), and that statute imposes two principal requirements. The first is that the "matter in controversy" must exceed "the sum or value of $75,000, exclusive of interest and costs[.]" 28 U.S.C. § 1332(a). In the context of this case, the second is that the dispute must be "between . . . citizens of a State and citizens or subjects of a foreign state[.]" *Id.* The party seeking to invoke diversity jurisdiction bears the burden to show that both requirements have been satisfied. *See Advani Enters., Inc. v. Underwriters at*

---

[10] Malfait confirmed this claim (Tr. 56:9-12), making it one of the very few of Pham's claims that was corroborated by other evidence. But Malfait added that he was induced to say this by Pham's false story about the deposit. (Tr. 56:13-15.) At the time he told Pham to "do absolutely whatever was necessary to get the deposit back," he had been falsely told that "the money was being held by a seller of an airplane." (Tr. 56:9-15.)

*Lloyds*, 140 F.3d 157, 160 (2d Cir. 1998) (diversity of citizenship); *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (amount in controversy).

Here, Richardson has satisfied the amount-in-controversy requirement. He claims compensatory damages of at least $115,000, treble damages of $300,000, and punitive damages. (Compl., ECF No. 1, at 15.) Richardson has also demonstrated that the parties' citizenship is diverse. He is a citizen of the United Kingdom (*see* Stipulation ¶ 1; Tr. 120:12-13, 121:4; Pl.'s Exs. 1, 12), and Pham is a Connecticut citizen. (Tr. 223:24.) Pham is also Bi-Li's sole member (Disclosure Statement, ECF No. 12), and accordingly Bi-Li is also a Connecticut citizen for diversity jurisdiction purposes. *Carter v. HealthPort Techs., LLC,* 882 F. 3d 47, 60 (2d Cir. 2016) (stating that the citizenship of an LLC "is determined by the citizenship of each of its members"). Because "there is no plaintiff and no defendant who are citizens of the same state," *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 388 (1998), and because the amount-in-controversy requirement is satisfied, diversity jurisdiction exists under 28 U.S.C. §1332. To the extent that the Defendants contended otherwise in their Second Affirmative Defense (Answer, Aff. Defs. & Counterclaim, ECF No. 26, at p. 9), that defense is rejected.

### B.    Choice of Law

Having determined that it has jurisdiction over the subject matter, the Court must next determine which body of law to apply. When a plaintiff sues in federal court and invokes diversity jurisdiction, the court "must apply the choice-of-law rules of the state in which that court sits[.]" *Liberty Synergistics, Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). But when the parties agree that a particular state's law governs the actions, a court "may apply [that state's] law without engaging in a choice-of-law analysis." *Dilek v. Watson Enters., Inc.*, 885 F. Supp. 2d 632, 641 (S.D.N.Y. 2012) (citing *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004)). In this

case, the parties stipulated that "Connecticut law applies to the Plaintiff's claims, the Defendants' affirmative defenses and counterclaim." (Jt. Trial Memo., ECF No. 85, at 12.) Moreover, they cited Connecticut authorities almost exclusively in their proposed conclusions of law and their post-trial briefs. (*See generally* Pl.'s Preliminary Proposed Findings of Fact and Conclusions of Law, ECF No. 86; Defs.' Preliminary Proposed Findings of Fact and Conclusions of Law, ECF No. 90; Defs.' Post-Tr. Br., ECF No. 118; Pl.'s Post-Tr. Br., ECF No. 119.) The Court will therefore apply Connecticut law to this dispute.

### C.    Count One:  Identity Theft

In the first count of his complaint, Richardson alleged that the Defendants committed identity theft under Section 52-571h of the Connecticut General Statutes. (Compl., ECF No. 1, at 8-10.) That statute permits "[a]ny person aggrieved by an act constituting a violation of" Connecticut's criminal identity theft statutes, Conn. Gen. Stat. §§ 53a-129a through 53a-129e, to bring an action for damages "against the person who committed the violation." Conn. Gen. Stat. § 52-571h(a). Section 53a-129a, in turn, provides that "[a] person commits identity theft when such person knowingly uses personal identifying information of another person to obtain or attempt to obtain money, credit, goods, services, property or medical information without the consent of such other person." Section 53a-129b defines "personal identifying information" to include "any name, number, or other information that may be used, alone or in conjunction with any other information, to identify a specific individual including but not limited to, such individual's name . . . motor vehicle operator's license number, . . . [and] government passport number." Conn. Gen. Stat. § 53a-129a(b).

The Defendants attempt two legal arguments in an effort to avoid liability under Section 52-571h, but neither one is persuasive. First, they misconstrue Richardson's identity theft claim

as having been made exclusively under Section 53a-129a, and they argue that it "fails" because Section 53a-129a "is a criminal statute and does not provide for a civil cause of action." (Defs.' Preliminary Proposed Findings of Fact and Conclusions of Law, ECF No. 90, at 4.) But Richardson clearly asserted his claim under Section 52-571h (Compl., ECF No. 1, ¶¶ 39, 40), and it is equally clear that Section 52-571h provides a civil cause of action for any act that constitutes a violation of Sections 53a-129a through -129e. Conn. Gen. Stat. § 52-571h; *see also White v. FCW Law Offices*, 352 Conn. 718, 719-20 (2025). Second, the Defendants argue without any citation to authority that Richardson cannot prevail under Section 52-571h unless he proved that they took the deposit intending to keep it. (*See* Defs.' Post-Tr. Br., ECF No. 118, at 8.) While the Court has no trouble finding as a matter of fact that Pham did have such an intent at the time he induced Aviators to release the deposit, the Defendants' legal argument is mistaken. The statute clearly requires only a knowing, rather than an intentional, level of *mens rea.* Conn. Gen. Stat. §52-571h (stating that "[a] person commits identity theft when such person knowingly uses personal identifying information of another person"); *Hudson v. Babilonia*, 192 F. Supp. 3d 274, 290-94 (D. Conn. 2016) (containing extensive discussion of the "knowing[]" *mens rea* requirement under Section 52-571h); *compare State v. King*, 216 Conn. 585, 593 (1990) (explaining that an intentional *mens rea* requirement is satisfied when the actor "acted with the conscious objective to cause" the result); *with State v. Newton*, 330 Conn. 344, 361 (2018) ("An act is done knowingly if done voluntarily and purposely, and not because of mistake, inadvertence or accident.") (internal quotation marks omitted).

With those challenges addressed, the Court turns to the question of whether Richardson proved each element of his Section 52-571h claim at trial. He clearly proved the first element— that is, the requirement of knowing use of another person's personal identifying information—and

moreover, he did so out of Pham's own mouth. Pham admitted under oath that he sent Richardson's driver's license and passport to Aviators (Tr. 311:3-5), and those documents of course contained Richardson's "motor vehicle operator's license number" and "government passport number." (Pl.'s Exs. 1, 12.) Moreover, Pham used Richardson's name to set up the e-mail account that he used to dupe Aviators. (Pl.'s Ex. 17, at 4) (reflecting that Pham established the neil.a.richardson1963 Gmail account under Richardson's name, rather than his own). Thus, Pham knowingly used information that qualifies as "personal identifying information" under Section 53a-129b and, by extension, under Section 52-571h. Richardson likewise proved the second element—that is, that Pham knowingly used that personal identifying information "to obtain or attempt to obtain money." Pham admitted that his purpose in sending Richardson's passport and driver's license was to induce Aviators to wire the $100,000 to Bi-Li's account. (Tr. 311:6-11.) Indeed, the record is so clear on these two points that the Defendants essentially conceded them in their post-trial brief. (*See* Defs.' Post-Tr. Br., ECF No. 118, at 7-8) (acknowledging "[t]he defendants' use of plaintiff's name, driver's license and passport information," and claiming that they did so "to obtain the return of the deposit from Aviators").

The Defendants contest only the third element of lack of consent (*id.*), but the Court holds that Richardson proved this element as well. Section 52-571h does not impose liability unless the actor used another person's personal identifying information "without the consent of such other person[,]" and the Defendants argue that Richardson consented to the use of his passport and driver's license to secure the return of the deposit from Aviators. (*Id.* at 8.) Specifically, the Defendants claim—without any credible, supporting evidence—that "the seller was making a claim against the deposit," and they say that they therefore received an "express request from the plaintiff to defendants . . . to do whatever they had to obtain the return of the deposit as the seller

29

of the aircraft was demanding the deposit." (*Id.* at 4.)[11] But the Court has found that Pham knew that "do whatever" did not include an authorization to use Richardson's passport and driver's license to hoodwink Aviators into sending $100,000 to Bi-Li. As Richardson points out in his post-trial brief, if Pham wanted to secure the return of the deposit honestly, all he would have had to do is ask Malfait or Richardson to communicate with Wilson directly. (Pl.'s Post-Tr. Br., ECF No. 119, at 5.) Instead, he spent at least three days cooking up and effectuating a complex scheme that involved using Richardson's name to set up a sham e-mail account, masquerading as Richardson in multiple e-mails to Aviators, and sending Richardson's passport and driver's license to Aviators for the purpose of inducing it to transfer the deposit to Bi-Li's account rather than Richardson's. Given these facts, no reasonable person could reach any conclusion other than that Pham knew he was not authorized to use Richardson's personal information in the way that he did. Furthermore, even in Pham's fanciful telling, he was authorized to use Richardson's information to obtain the return of the deposit *to Richardson.* He does not even attempt to claim that he was authorized to use that information to direct the transfer of the deposit *to Bi-Li.* (*See* Defs.' Post-Tr. Br., ECF No. 118, at 8.) In summary, Richardson proved all three elements of his identity theft claim at trial, and the Court will award him damages on that claim in Section V below.

---

[11]    In their post-trial brief, the Defendants attribute this "express request" directly to Richardson. (Defs.' Post-Tr. Br., ECF No. 118, at 4, 7.) But their citation is to their attorney's question, not to Richardson's answer, and it is well established that an attorney's question is not evidence. *E.g., United States v. McFadden*, No. 13-cv-284 (DRH), 2015 WL 6506945, at *10 (E.D.N.Y. Oct. 27, 2015) ("An attorney's question, however, is not evidence. Only the answer to the question is evidence."). To be sure, *Malfait* told Pham "to do absolutely whatever was necessary to get the deposit back," after having been falsely told by Pham "that the money was being held by a seller of an airplane[.]" (Tr. 56:9-15.) But the trial transcript does not record *Richardson* instructing anyone to "do whatever to get the money back," as the Defendants claimed in their brief.

Finally, the Court holds for Richardson on Count One against both Pham and Bi-Li. Corporations as well as natural persons can be liable under Section 52-571h. *Nelson v. New England Urgent Care, LLC*, No. HHD-CV-18-60883930-S, 2018 WL 7046893, *3 (Conn. Super. Ct. 2018) (holding that the word "person" in § 52-571h "encompass[es] limited liability companies"); *see also* Conn. Gen. Stat. § 1-1(k) (explaining that the word "person," for the purposes of Connecticut's statutory scheme, should "extend and be applied to," among other things, "companies, corporations, public or private, [and] limited liability companies"). Because both Pham and Bi-Li satisfy all elements of the statute, the Court will award damages against them jointly and severally on Count One.

**D.    Conversion**

In Counts Two and Three of his complaint, Richardson alleged that the Defendants committed the tort of conversion. (Compl., ECF No. 1, at 10-12.) Count Two concerned the $100,000 deposit, and in it, Richardson alleged that the Defendants converted the deposit by "creating the Fake Account;" "using the Fake Account to correspond with the Escrow Company ostensibly in Richardson's name;" "using the Fake Account to send Richardson's driver's license and passport to the Escrow Company;" "subsequently receiving the transfer of the Deposit from the Escrow Company," and "refus[ing] Richardson's demand for the return of the deposit." (*Id.* at 10-11.) Count Three concerned the $15,000 expense advance. (*Id.* at 11-12.) Richardson alleged that the Defendants converted the $15,000 "by failing to account for any expenditures, which was an express condition to Richardson's agreement to" make the advance; "by spending [the advance] for their own personal enjoyment[;]" and by "refus[ing] Richardson's demand for the return of the Advanced Expenses." (*Id.*)

The legal principles governing this claim are well established.  "The tort of conversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights." *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 770-71 (2006) (quoting *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 43 (2000)). "Thus, '[c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm.'" *Id.* (quoting *Label Sys. Corp. v. Aghamohammadi*, 270 Conn. 291, 329 (2004).  A defendant can still be liable for conversion even if possession of the property was originally authorized.  In Connecticut, "there are two 'general classes' of conversion:  (1) that in which possession of the allegedly converted goods is wrongful from the onset; and (2) that in which the conversion arises subsequent to an initial rightful possession." *Luciani v. Stop & Shop Companies, Inc.*, 15 Conn. App. 407, 410 (1988) (citing *Coleman v. Francis*, 102 Conn. 612, 615 (1925)). Thus, a defendant can be liable for conversion where possession of the plaintiff's property was originally authorized but becomes tortious by, among other things, wrongful use of the property. *Coleman*, 102 Conn. at 615.  "The intent required for a conversion is merely an intent to exercise dominion or control over an item even if one reasonably believes that the item is one's own." *Plikus v. Plikus*, 26 Conn. App. 174, 180 (1991).

The Defendants raise two legal arguments about Richardson's conversion claims, but the Court disagrees with them both.  Their first argument is a claim that conversion plaintiffs like Richardson "must satisfy [a] higher standard of proof," "requiring clear and convincing evidence." (Defs.' Post-Tr. Br., ECF No. 118, at 9.)  But they appear to have confused the standard for conversion with the standard for awards of treble damages for statutory theft under Conn. Gen. Stat. § 52-564.  (*See id.*) (citing *Lawson v. Whitey's Frame Shop*, 42 Conn. App. 599, 606 n.8

32

(1996), in which the Connecticut Appellate Court distinguished statutory theft from conversion in part by explaining that the former requires "a higher standard of proof, namely, clear and convincing evidence, in order for a trial court to award treble damages"). For a simple conversion claim, "[t]he plaintiff's burden to prove conversion is by a fair preponderance of the evidence." *Emigrant Mortg. Co., Inc. v. Travelers Prop. Cas. Corp.*, No. 3:16-cv-429 (SRU), 2020 WL 616577, at *3 (D. Conn. Feb. 10, 2020) (citing *Yaneczki v. Moeckel*, No. HHD-CV-13-5036986-S, 2013 WL 5496458, at *6 (Conn. Super. Ct. Sept. 10, 2013)).

The second argument requires more discussion, but it is ultimately no more persuasive in the context of this case. The Defendants appear to suggest that cash cannot be a proper subject for a conversion claim (Defs.' Post-Tr. Br., ECF No. 118, at 9), and put that way, their argument is contrary to law. *Deming*, 279 Conn. at 771 ("Under our case law, money can clearly be subject to conversion.") (brackets, citations, and quotation marks omitted). But it is true that, to prevail on a claim for conversion of money, the plaintiff "must establish . . . legal ownership or right to possession of specifically identifiable moneys." *Id.* at 772 (citing *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 650 (2002)). "An action for conversion of funds may not be maintained to satisfy a mere obligation to pay money[,]" and "an action in tort is inappropriate where the basis of the suit is a contract, either express or implied." *Macomber*, 261 Conn. at 650. Put differently, "in order to establish a valid claim of conversion . . . a party must show ownership or the right to possess specific, identifiable money, rather than the right to the payment of money generally." *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 421 (2007). Thus, the question presented here is whether Richardson's deposit and advance were "specifically identifiable moneys" in the contemplation of the law of conversion, or whether instead they were a contractual "indebtedness" that could be satisfied by money from anywhere.

33

The distinction between "specifically identifiable moneys" and general indebtedness is explained in the Florida case of *Belford Trucking Co. v. Zagar*, one of several out-of-state authorities that the Connecticut Supreme Court cited with approval in *Deming* and *Macomber*. *Deming*, 279 Conn. at 772 (citing *Belford Trucking Co. v. Zagar*, 243 So.2d 646, 648 (Fla. App. 1970); *Macomber*, 261 Conn. at 650 (same). In *Belford Trucking*, the Florida Court of Appeal began by stating the general principle that "[t]here is nothing in the nature of money as personal property which makes it an improper subject of conversion so long as it consists of specific money capable of identification." 243 So.2d at 648 (citing *Russell v. The Praetorians*, 248 Ala. 576 (1947)). It then explained that, "[t]o be a proper subject of conversion each coin or bill need not be earmarked, but there must be an obligation to keep intact or deliver the specific money in question, so that such money can be identified." *Id.* (citing *Shahood v. Cavin*, 154 Cal. App. 2d 745 (1957)). "Money is capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit, or where wrongful possession of such property is obtained." (*Id.*) (citing *Hazelton v. Locke*, 104 Me. 164 (1908)).

A 2012 decision by Judge Hall shows the *Belford Trucking* principle in action. In *Lord v. International Marine Insurance Services*, an insurance company rescinded its policy and attempted to return the premium to the policyholder. No. 3:08-cv-1299 (JCH), 2012 WL 12978056, at *2 (D. Conn. Nov. 7, 2012). The policyholder disagreed with the insurer's decision and declined to cash the check, so the insurer stopped payment on it and reissued it to the agent who had brokered the policy. *Id.* After the insurer prevailed in a declaratory judgment action, the policyholder demanded the premium that he had previously refused, and when the agent failed to return it, he sued for statutory theft. *Id.* at *5. The agent moved to dismiss, arguing that the policyholder's

claim was "based solely on money owed for a debt, and not the type of 'identifiable moneys' required under Connecticut law." *Id.* at *6. But Judge Hall disagreed. "While it is true that [the policyholder] claims he is owed money, the claims are not for a generalized sum of money, but for the exact money that he submitted to" the insurer. *Id.* The policyholder had sent a specific sum of money to the company, which redirected it to a broker who wrongfully retained it, and the complaint sought "return of the contents of that specific money transfer, money that was originally sent by [the policyholder], and not a generalized debt obligation." *Id.*; *see also Pateley Assocs., LLC v. U.S. Bank, N.A.*, No. FST-CV-12-6015568-S, 2017 WL 1311098, at *6 (Conn. Super. Ct. Mar. 17, 2017) (holding that funds in a mortgage escrow account were "specifically identifiable moneys" and therefore a proper subject of a conversion claim); *but see Cherry Hill Constr., Inc. v. E.F.S. Machinery, LLC*, No. NNH-CV-15-6053196-S, 2015 WL 3975711, at *3 (Conn. Super. Ct. June 3, 2015) (holding that a deposit on a piece of construction equipment was not a proper subject of conversion).

Applying these principles, the Court concludes that Richardson is entitled to recover under Count Two. The Defendants assumed and exercised control over the $100,000 deposit (Pl.'s Exs. 13, 35), and the deposit clearly belonged to Richardson. (*See* Pl.'s Ex. 9A) ("Terms and Conditions of Escrow" document from Aviators, stating that "[a]ll funds deposited to escrow are fully refundable to the Depositor"). The Defendants' assumption and exercise of control was done without Richardson's authorization (*see* discussion, Section IV.C *supra*), and to the exclusion of Richardson's rights. Furthermore, the deposit constitutes "specifically identifiable moneys" under the *Belford Trucking* principle, because Richardson seeks "return of the contents of that specific money transfer, money that was originally sent by [him], and not a generalized debt obligation." *Lord*, 2012 WL 12978056, at *6.

The Court also concludes that Richardson is entitled to recover on Count Three. He placed a single sum of $15,000 under the Defendants' control, "by one act and in one mass," *Belford Trucking*, 243 So.2d at 648, and he seeks "return of the contents of that specific money transfer, money that was originally sent by [him], and not a generalized debt obligation." *Lord*, 2012 WL 12978056, at *6. He transferred that single sum into the Defendants' control on the understanding that they would use it to defray documented expenses, but they never proved any. (*See* discussion, Section III.B.3 *supra.*) Their assumption and exercise of control therefore became wrongful at that point, and it does not matter that Richardson had previously authorized it. *See Luciani*, 15 Conn. App. at 410 (noting that conversion can arise either when "possession of the allegedly converted goods is wrongful from the onset," or "subsequent to an initial rightful possession"). In summary, the Court will find for Richardson on both of his conversion counts.

### E.     Breach of Fiduciary Duty

In Count Four of his complaint, Richardson alleged that Pham "breached the fiduciary duties he owed to Richardson." (Compl., ECF No. 1, ¶ 58.) The essential elements of a cause of action for breach of fiduciary duty in Connecticut are: "(1) That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2) That the defendant advanced his own interests to the detriment of the plaintiff; (3) That the plaintiff sustained damages; [and] (4) That the damages were proximately caused by the fiduciary's breach of his . . . fiduciary duty." *Edelson v. Chapel Haven, Inc.*, No. 3:15-cv-01862 (SRU), 2017 WL 810274, at *17 (D. Conn. Mar. 1, 2017) (quoting *AW Power Holdings, LLC v. FirstLight Waterbury Holdings, LLC*, Docket No. HHD-CV-14-6047836-S, 2015 WL 897785, at *4 (Conn.

36

Super. Ct. Feb. 17, 2015)) (citation modified).  The Connecticut Supreme Court has recognized that some actors are *per se* fiduciaries, including "agents, partners, lawyers, directors, trustees, executors, receivers, bailees, and guardians." *Iacurci v. Sax*, 313 Conn. 786, 800 (2014) (quoting *Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 108–09 (2007)). "Beyond these *per se* categories, however, a flexible approach determines the existence of a fiduciary duty[.]" *Id.*  A fiduciary relationship is "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill, or expertise and is under a duty to represent the interests of the other." *Falls Church Group, Ltd.*, 281 Conn. at 108 (quoting *Cadle Co. v. D'Addario,* 268 Conn. 441, 455 (2004)) (internal quotation marks omitted). Because some commercial transactions do not have these attributes, the Connecticut Supreme Court has "recognized that not all business relationships implicate the duty of a fiduciary." *Hi-Ho Tower, Inc.*, 255 Conn. at 38.  Indeed, courts have "refused to recognize a fiduciary relationship" when "the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence." *Id.* at 39.

Richardson initially presented his breach of fiduciary duty claim as arising out of a duty of loyalty allegedly owed by aircraft consultants to their customers.  His complaint alleged that a fiduciary relationship existed "at all relevant times" (*id.* ¶ 57), including before any money changed hands between him and Pham, and it claimed damages of $115,000 under Count Four, meaning that he thought Pham was a fiduciary with respect to both the $100,000 deposit and the $15,000 advance.  Furthermore, his pre-trial memorandum claimed to observe a fiduciary obligation, arising out of Pham's "superior knowledge, skill and expertise" and resulting in Richardson's "trust and confidence that [he] placed in [Pham] to locate suitable aircraft . . . and to

37

handle almost all aspects of a transaction involving millions of dollars." (Pl.'s Trial Memo., ECF No. 86, at 8, ¶ 12.)

Richardson did not prove that theory of fiduciary liability at trial. He did not testify that he reposed special trust and confidence in Pham as an aircraft consultant. On the contrary, Richardson testified that Pham did nothing—and was not hired to do anything—that he could not do himself. (*See, e.g.*, Tr. 126:23-127:6 (testifying that he could have found Piaggio Avantis on the internet himself); 158:12-159:13 (testifying that Pham's claimed role as an aircraft inspector would not have been especially valuable to him, because there is always "video . . . available from the seller" and "a comprehensive package of information," similar to "if you buy a high-end car," and that he could have "done all that" himself). In presenting himself as sufficiently knowledgeable about aircraft to locate and buy one on his own, Richardson negated any suggestion that he and Pham were in a "relationship of dominance and dependence" with respect to the contemplated transaction, or that Pham had "superior knowledge, skill, or expertise."

Richardson attempted a different theory of fiduciary liability in his post-trial brief, at least with respect to the $100,000 deposit. At trial, his counsel asked Pham whether, at the time he "got control of the $100,00," he was "holding it in trust[.]" (Tr. 319:9-11.) Pham answered, "[o]kay, yes." (Tr. 319:12.) Richardson attempts to parlay this brief exchange into an argument that, because trustees are fiduciaries *per se*, Pham's two-word admission resolves Count Four in his favor. (Pl.'s Post-Tr. Br., ECF No. 119, at 8.) But this argument cannot be accepted in its underdeveloped state, because it fails to address (among other things) whether testimony from a lay witness on a legal question can bear such weight, even when the witness's counsel fails to object to it; why the Court should credit it as a factual matter, when Richardson has otherwise

contended that Pham is entirely incredible; whether it would require a pleading amendment under Rule 15(b); and so forth.  The Court will therefore find for Pham on Count Four.

### F.    Constructive Fraud

In the fifth and final count of his complaint, Richardson asserted a claim for constructive fraud against Pham.  (Compl., ECF No. 1, ¶¶ 61-66.)  He asserted that, "[a]t all relevant times, a fiduciary relationship existed between Richardson, on the one hand, and Willy Pham, on the other, whereby Willy Pham (a) owed a duty of loyalty to Richardson; (b) was obligated to act in the best interests of Richardson; and (c) was obligated to act in good faith in connection with the Proposed Transaction."  (*Id.* ¶ 62.)  He alleged that Pham violated his fiduciary duty by "fail[ing] to disclose . . . his wrongful intent to steal the Advance Expenses and the Deposit."  (*Id.* ¶ 63.)  In other words, Count Five of Richardson's complaint alleged that a fiduciary relationship existed between him and Pham from the very beginning (*see id.* ¶ 62) ("At all relevant times . . . "); that Pham breached the duty even before he took the money, by failing to disclose his plan to do so (*see id.* ¶ 63) (alleging that Pham "failed to disclose . . . his wrongful intent to steal"); and that he committed the tort of constructive fraud in the process.  (*Id.* at 13.)

The Connecticut Appellate Court has warned litigants not to confuse constructive fraud with actual fraud.  "The burden of proof and the elements necessary in an action for constructive fraud differ markedly from the prerequisites to liability for actual fraud."  *Mitchell v. Mitchell*, 31 Conn. App. 331, 334 (1993).  Liability for constructive fraud is based on "[t]he breach of a confidential or special relationship[.]"  *Id.* (citing, *inter alia*,  *Worobey v. Sibieth*, 136 Conn. 352 (1949))  The plaintiff must establish the existence of a special relationship, and once he does, "the burden shifts to the fiduciary to prove fair dealing by clear and convincing evidence."  *Id.* at 335 (citing *Dunham v. Dunham*, 204 Conn. 303, 322-23 (1987)).  Actual fraud, by contrast, requires

proof "(1) that a false representation of fact was made; (2) that the party making the representation knew it to be false; (3) that the representation was made to induce action by the other party; and (4) that the other party did so act to her detriment." *Chase Manhattan Mortg. Corp. v. Machado*, 83 Conn. App. 183, 188 (2004).[12]

In this case, Richardson failed to prove a "confidential or special relationship" that could serve as a basis for a claim of constructive fraud.   Here, as in Count Four, a special relationship is one "in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Dunham*, 204 Conn. at 320; *see also Hi-Ho Tower, Inc.*, 255 Conn. at 38 ("It is well settled that a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.") (Internal quotation marks omitted.) When he testified that he did not rely on Pham to locate or evaluate a suitable plane (Tr. 126:23-127:6, 158:12-159:13), Richardson essentially negated the sort of constructive fraud claim that he pled in his complaint by eroding the precondition of such a claim.

Perhaps for this reason, Richardson pivoted to actual fraud in his post-trial brief.   In that submission, he recited the elements of actual fraud rather than constructive fraud, and he asserted that they were satisfied by Pham's false story about the seller's threat to seize the deposit.  (Pl.'s Post-Tr. Br., ECF No. 119, at 9.)  But whatever the merits of that claim may be, it is not the claim that he pled, and he has not moved for leave to amend his complaint post-trial to conform to the

---

[12]     To be sure, some Superior Court judges have narrowed the gap between constructive fraud and actual fraud by requiring constructive fraud plaintiffs to plead and prove a special relationship *and* the elements of actual fraud. *E.g., Vic's Montowese Pizzeria, LLC v. Kwierga*, No. NNH-CV-19-6091342-S, 2023 WL 6575752, at *3 (Conn. Super. Ct. Oct. 5, 2023); *Vega v. Lana*, No. NNH-CV-12-4017586-S, 2013 WL 5780432, at *3 (Conn. Super. Ct. Oct. 4, 2013).  So far as the Court's research discloses, however, the Connecticut appellate courts have not done so.

evidence.  *See* Fed. R. Civ. P. 15(b)(2).  The Connecticut Appellate Court has made clear that constructive fraud and actual fraud are distinct causes of action, *Mitchell*, 31 Conn. App. at 334, and the Court declines to amend Richardson's complaint *sua sponte* to plead the latter.  The Court finds for Pham on Count Five.

### G.    Defendants' Affirmative Defenses

The Defendants asserted six affirmative defenses (Answer at 8-10), but each of them can be quickly dismissed.  Their First Affirmative Defense alleged that "Richardson's Complaint fails to state facts sufficient to constitute a cause of action or causes of action upon which relief can be granted" (*id.* at 8), but they have never explained why, either in a motion under Rule 12(b) or in their post-trial brief.  The Court rejects this defense because each cause of action was sufficiently pled.  The Defendants' Second Affirmative Defense alleged a lack of subject matter jurisdiction, for failure to satisfy the amount-in-controversy requirement (*id.* at 9), but the Court has already held in Section IV.A that the requirement has been met.

In their Third Affirmative Defense, the Defendants alleged that Richardson's claims "are barred in whole or in party [*sic*] by the doctrine of equitable estoppel."  (*Id.*)  Under Connecticut law, "any claim of estoppel is predicated on proof of two essential elements[.]"  *Chotkowski v. State*, 240 Conn. 246, 268 (1997) (quoting *Conn. Nat'l Bank v. Voog*, 233 Conn. 352, 366 (1995)).  First, "the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief[.]"  *Id.*  Second, "the other party must change its position in reliance on those facts, thereby incurring some injury."  *Id.*  "Estoppel rests on the misleading conduct of one party to the prejudice of the other.  In the absence of prejudice, estoppel does not exist."  *Fischer v. Zollino*, 303 Conn. 661, 668 (2012) (internal quotation marks omitted).  In this case, the Defendants did not prove that Richardson

41

misled them to their harm, and indeed they did not even mention this defense in their post-trial brief.  (*See generally* Defs.' Post-Tr. Br., ECF No. 118.)

In their Fourth Affirmative Defense, entitled "Unclean Hands," the Defendants alleged that Richardson "engaged in misconduct, which as a matter of equity, bars him from obtaining the relief he seeks in his Complaint."  (Answer at 9.)  "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply."  *Bauer v. Waste Mgmt. of Conn. Inc.*, 239 Conn. 515, 525 (1996).  Moreover, the doctrine does not apply when the other party seeks a legal remedy, such as money damages.  *See Weiss v. Smulders*, 313 Conn. 227, 265 n.19 (2014) ("[T]he equitable defense of unclean hands bars only equitable relief.").  Here, Richardson sought money damages rather than equitable relief.  (Compl., ECF No. 1, at 15.)  And even if he had done otherwise, the Defendants did not prove that he engaged in any misconduct.

In their Fifth Affirmative Defense, entitled "Setoff," the Defendants claimed that "Richardson . . . owes Pham monies, which should be set off against any amounts that Richardson alleges Pham owes him."  (Answer at 9.)  Setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A."  *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995).  "The party asserting the right bears the burden of establishing that right."  *Id.*  In this case, Pham did not prove that Richardson owes him any money.

Finally, the Defendants alleged in their Sixth Affirmative Defense that Richardson "authorized and/or ratified acts Pham undertook on his behalf."  (Answer at 10.)  But the Court

42

has already found that the Defendants did not have authority to mis-direct Richardson's deposit and retain his advance, for the reasons stated above.  In summary, the Defendants failed to prove any of their affirmative defenses.

### H.    Defendants' Counterclaim for Unjust Enrichment

The Defendants counterclaimed for unjust enrichment.  (Answer at 10.)  They claimed to have "identified approximately eight" aircraft for Richardson's consideration, and to have "incurred significant out-of-pocket costs" in doing so.  (*Id.* at 6.)  They added that, by the time Richardson terminated the project in November of 2022, they had "work[ed] for [him] for well over a year and had incurred over $56,000 in expenses and other fees."  (*Id.* at 8.)  They claimed that "Richardson has obtained benefits under circumstances that are unjust," and that those "benefits . . . should be disgorged."  (*Id.* at 10.)

A claim for unjust enrichment focuses on the benefit to the receiving party.  "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."  *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 451 (2009) (citation modified).  A party seeking recovery for unjust enrichment must first demonstrate the absence of a remedy under contract.  *Gagne v. Vaccaro*, 255 Conn. 390, 401 (2001).  If it makes that showing, it must then prove that (1) the opposing party was benefited, (2) the opposing party unjustly did not pay for the benefits, and (3) the failure of payment was to its detriment.  *Town of New Hartford*, 291 Conn. at 451-52 (quoting *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282-83 (1994)).  Whether the application of the doctrine of unjust enrichment is appropriate is a fact-specific inquiry.  *See id.* at 451 (emphasizing that unjust enrichment requires evaluation of whether, under the circumstances, it is "just or unjust,

equitable or inequitable, conscionable or unconscionable" to impose liability). When a court finds it equitable to apply the doctrine, the measure of recovery is the benefit conferred upon the opposing party, not the loss suffered by the complaining party. *Monarch Accounting Supplies, Inc. v. Prezioso*, 170 Conn. 659, 666–67 (1976) ("The damages should be the benefit received.") (citation omitted); *see also Town of New Hartford*, 291 Conn. at 451 ("[T]he basis of the plaintiff's recovery is the unjust enrichment of the defendant.") (internal quotation marks omitted).

At trial, the Defendants entirely failed to prove that they did anything more than a *de minimis* amount of work for Richardson, let alone any work that benefitted him. As detailed in Section III.B.2 above, they did not prove that they inspected even a single plane on Richardson's behalf. They did not prove that they gave him any valuable advice on structuring an aircraft time-sharing transaction. They claim to have "identified" eight airplanes for Richardson's consideration (Answer at 6; Pl.'s Ex. 14), but even if this were true, they failed to prove that this benefitted him in any meaningful way; Richardson testified without contradiction that any number of Piaggio Avantis can easily be "identified" for sale on the internet. (Tr. 126:24-127:6.) In their post-trial brief, the Defendants claim to have "evaluat[ed]" the eight aircraft in addition to simply "identifying" them. (Defs.' Post-Tr. Br., ECF No. 118, at 12.) But they tellingly provide no citation to the trial testimony or exhibits. (*Id.*) Richardson contends that the Defendants did little more than pass along some easily-located internet listings, and no credible testimonial or documentary evidence contradicts this contention. In summary, the Defendants failed to prove that Richardson was unjustly enriched, and the Court will therefore direct the Clerk to enter judgment in Richardson's favor on the counterclaim.

V.    DAMAGES, INTEREST, ATTORNEYS' FEES AND COSTS

A.    **Compensatory Damages**

Having concluded that Richardson established the Defendants' liability at trial, the Court must next determine the damages owed to him.  Under Counts One and Two, Richardson proved that he was damaged by the amount of $100,000.  The Defendants took that money out of his escrow account at Aviators, and although they tried to return $68,620 to him, they misdirected that payment to Luxury Lighting.  Put simply, Richardson is without a penny of his fully refundable $100,000 deposit through no fault of his own, and entirely through the fault of the Defendants.

Having found the Defendants liable under Count One, the Court must treble Richardson's damages.  The identity theft statute provides that, "[i]n any civil action brought under this section in which the plaintiff prevails, the court *shall* award the greater of one thousand dollars or treble damages[.]"  Conn. Gen. Stat. § 52-571h(b).  As the General Assembly's use of the word "shall" suggests, treble damages are mandatory once the defendant is found liable.  *See White*, 352 Conn. at 730-31 (explaining that "§ 52-571h(b) requires the trial court to award treble damages to a plaintiff who prevails").  The Court therefore awards Richardson $300,000 on Count One.

In his post-trial brief, Richardson cursorily suggested that he might be entitled to have the same $100,000 awarded to him yet again, under Count Two.[13]  (Pl.'s Post-Tr. Br. ECF No. 119, at 10-11.)  But he concedes with admirable candor that such an award would "likely" represent an impermissible "double recovery under the identity theft claim."  (*Id.* at 10.)  His guardedness on this point may have been a product of the fact that *White* was still pending at the Connecticut Supreme Court at the time he wrote.  (*See id.*)  And, to be sure, the court did ultimately hold in

---

[13]    He also sought an additional $100,000 under Count Four, and yet another $100,000 under Count Five (*id.*), but the Court has not found Pham liable under those counts.

*White* that a successful Section 52-571h plaintiff could recover treble damages under that statute, and recover damages yet again if he prevailed on a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"). *White*, 352 Conn. at 735-36. But notwithstanding *White,* the Court agrees that to award $300,000 under Count One and an additional $100,000 under Count Two would constitute an impermissible double recovery.

*White* endorsed recovery under both Section 52-571h and CUTPA because the two statutes "do not redress the same harm and, therefore, are not duplicative." *Id.* at 729-30. In this case, however, the identity theft claim in Count One and the conversion claim in Count Two address the same harm. *See AAA Advantage Carting & Demolition Serv., LLC v. Capone*, 221 Conn. App. 256 (2023) (reversing a trial court's award of double recovery for conversion and statutory theft because "the plaintiff was compensated twice for the same loss," and both claims were "based on the [same] withdrawal"). Thus, while the Court finds both Defendants liable under Count Two, it declines to award damages under that count because to do so would violate the common law rule against double recovery. *Catalina v. Nicolelli*, 90 Conn. App. 219, 225 (2005) ("Duplicate recoveries must not be awarded for the same underlying loss under different legal theories.").

Finally, the Court awards Richardson $15,000 under Count Three. He proved at trial that he paid $15,000 to the Defendants, and that they have neither earned nor returned any of it. In summary, the Court awards $315,000 in compensatory damages to Richardson, jointly and severally against both Pham and Bi-Li.

### B.    Punitive Damages

Richardson also sought punitive damages in his complaint. (Compl., ECF No. 1, at 15.) Under Connecticut law, common law punitive damages are recoverable "when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights."

*Vandersluis v. Weil*, 176 Conn. 353, 358 (1978).  Provided that the plaintiff makes this showing, punitive damages can be awarded in cases of conversion.  *Label Sys. Corp. v. Aghamohammadi*, No. X02-CV-93-0156709-S, 2002 WL 1843051, at *6 (Conn. Super. Ct. July 12, 2002) (awarding punitive damages after jury found defendants liable for conversion).  In this case, the Court has little trouble concluding that the Defendants committed an "intentional and wanton violation" of Richardson's rights when they schemed to move the $100,000 deposit out of his escrow account and into Bi-Li's account.

In Connecticut, however, common law punitive damages are limited to the plaintiff's "litigation expenses, such as attorney's fees less taxable costs."  *Hylton v. Gunter*, 313 Conn. 472, 484 (2014).  Moreover, "within that limitation, the extent to which they are awarded is in the sole discretion of the trier."  *Label Sys. Corp.*, 270 Conn. at 335.  In this case, Richardson is already likely to be awarded his attorneys' fees and costs under Count One.  Conn. Gen. Stat. § 52-571h(b) ("In any civil action brought under this section in which the plaintiff prevails, the court shall award the greater of one thousand dollars or treble damages, together with costs and a reasonable attorney's fee.").  The role of common law punitive damages in Connecticut is to "fully compensate[e] a victim for the harm inflicted on him," *Waterbury Petro. Prods., Inc. v. Canaan Oil & Fuel Co., Inc.*, 193 Conn. 208, 238 (1984), and here, Richardson will probably be fully compensated by the award of fees and costs under Section 52-571h.  Thus, the Court declines to award common law punitive damages under Counts Two and Three, despite the reprehensibility of Pham's conduct.

## C.    Prejudgment Interest, Attorneys' Fees and Costs

Richardson claimed prejudgment interest in his complaint.  (Compl., ECF No. 1, at 15.) But he did not argue that he was entitled to such an award in his post-trial brief, nor did he propose

47

a rate.  When confronted with a similar situation in *One Barberry Real Estate Holding, LLC v. Maturo*, Judge Nagala declined to consider the issue without further guidance from the parties, because "Plaintiffs' entitlement to prejudgment interest and the appropriate interest rate are not straightforward issues."  698 F. Supp. 3d 252, 368 n.102 (D. Conn. Oct. 3, 2023).  The same is true here.  With respect to whether Richardson is entitled to prejudgment interest at all, at least some courts have declined to award interest when the plaintiff has already recovered treble damages.  *E.g., Vergules v. Rembert*, No. FBT-CV-20-6095243-S, 2025 WL 3281372, at *1 (Conn. Super. Ct. Nov. 18, 2025).  And in cases where interest has been awarded, the rate is often chosen with reference to American yardsticks like the federal funds interest rate, *e.g. Pizziconi v. Gray*, No. 3:23-cv-1080 (KAD), 2025 WL 2432673, at *11 (D. Conn. Aug. 22, 2025), but the propriety of doing so in a case with an English plaintiff is not obvious.  For these reasons, the Court will do as Judge Nagala did in *One Barberry*, and authorize Richardson to file a motion under Fed. R. Civ. P. 59(e) to amend the judgment to account for prejudgment interest if he wishes to pursue the issue.  *One Barberry*, 698 F. Supp. 3d at 368 n.102.

Richardson also claimed attorneys' fees and costs in his complaint.  (Compl., ECF No. 1, at 15.)  In federal court, "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."  Fed. R. Civ. P. 54(d)(2)(A).  Furthermore, "[u]nless a statute or a court order provides otherwise, the motion must . . . be filed no later than 14 days after the entry of judgment;" "specify the judgment and the statute, rule, or other grounds entitling the movant to the award;" "state the amount sought or provide a fair estimate of it; and . . . disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made."  Fed. R. Civ. P. 54(d)(2)(B).  Following Rule 54(d), the Court directs Richardson to file any attorney fee motion

48

he may wish to make by April 14, 2026.  The motion shall include the number of attorney hours claimed; an itemized statement of the work performed and costs incurred; an itemized statement of whether the hours were incurred by an attorney, paralegal or other employee; the corresponding hourly rates; and shall be supported by a brief explaining why these numbers are reasonable.  *One Barberry,* 698 F. Supp. 3d at 371.  The Defendants are entitled to a response, *see* Fed. R. Civ. P. 54(d)(2)(C), and their deadline for filing one is May 5, 2026.  D. Conn. L. Civ. R. 7(a)2. Richardson may file a reply on or before May 19, 2026.  D. Conn. L. Civ. R. 7(d).

## VI.   CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that the Plaintiff, Neil Richardson, has proven the claims in Counts One, Two, and Three of his complaint by a preponderance of the evidence. The Court further finds that Richardson failed to prove the claims in Counts Four and Five.  The Clerk of the Court is respectfully directed to enter judgment in favor of Richardson in the amount of $315,000.00, jointly and severally against the Defendants Willy L. Pham and Bi-Li Aviation, LLC.  The Clerk is further directed to enter judgment in Richardson's favor on the Defendants' counterclaim.

Richardson shall file any motion for attorneys' fees and costs, as outlined in Section V.C above, by April 14, 2026.  Any motion to amend the judgment under Rule 59(e) to add an award of prejudgment interest shall also be filed by April 14, 2026.  It is so ordered.

Entered at Hartford, Connecticut this 31st day of March, 2026.

*/s/ Thomas O. Farrish*

Hon. Thomas O. Farrish
United States Magistrate Judge

49